Bennie Wolf v. Commissioner. David Katz v. Commissioner.Wolf v. CommissionerDocket Nos. 21249, 21253, 13708.United States Tax Court1950 Tax Ct. Memo LEXIS 66; 9 T.C.M. (CCH) 942; T.C.M. (RIA) 50254; October 25, 1950James J. Waters, Esq., 712 Commerce Bldg., Kansas City 6, Mo., and Daniel L. Brenner, Esq., for the petitioners. Frank M. Cavanaugh, Esq., for the respondent. DISNEYMemorandum Findings of Fact and Opinion DISNEY, Judge: These cases, duly consolidated for trial, involve deficiencies and penalties against the parties for years and in amounts as follows: Bennie Wolf50%YearDeficiencyPenalty1942 Income Tax$ 1,493.05$ 746.531943 Income and VictoryTax10,644.405,322.201944 Income Tax3,201.961,600.981945 Income Tax2,306.06Total$17,645.47$7,669.71David Katz1942 Income Tax$ 989.03$ 494.521943 Income and VictoryTax10,444.405,222.201944 Income Tax7,048.073,524.041945 Income Tax2,951.42Total$21,432.92$9,240.76*67 The question involved as to the years 1942 to 1944, inclusive, is whether the respondent erred in his determination of the tax deficiencies and in assessing the 50 per cent penalty for fraud. The principal issue is whether the petitioners' income, determined by the Commissioner on the basis of net worth, is explained by alleged borrowings by the petitioners from their uncle. As to 1945 the only question is whether there was error in the Commissioner's restoration of a write-down in inventory at the close of that year. Findings of Fact The petitioners are first cousins. During 1942-1945, inclusive, they were partners in the operation of retail shoe stores in Kansas City, Missouri, having formed an equal partnership under the name Katz Shoe Stores on June 27, 1941. Prior to that date Bennie Wolf had been a shoe salesman at $50 a week and bonus and David Katz had been a shoe salesman-manager at $35 a week plus bonus. Bennie Wolf will be hereinafter sometimes referred to as Wolf and David Katz as Katz. Both were high school graduates and Katz had been in college about one and one-half years. Neither had any property of consequence. Katz had personal property of about $2,500 but did*68 not own his home. Wolf had property worth about $1,500. The business started with one store in 1941, but by the latter part of 1942 they had two stores, and four about the end of 1943. Katz did most of the financial business for the stores. In April 1944 Louis N. Wolf became a "silent partner" with a 20 per cent interest. Ruben or R. Katz, a merchant, was worth about $100,000 about 1917 and inherited about $23,000 from his wife about 1940. He had immigrated to America about 1887, had kept a small store, over which he lived, and had saved his money. He had a safe deposit box which he visited a number of times during 1942-1944. He made some loans to petitioners during that period. He reported income in Federal income tax returns totaling $21,416.35 from 1913 to 1940, inclusive. His returns for 1942 to 1945, inclusive, reported a total of $7,556.34 No interest was reported for 1942. For 1943 $505.88 interest was reported, none from petitioners, their wives, or the partnership; $135 was reported from Julius C. Shapiro. For 1944, $667.04 interest was reported, none of it from petitioners, their wives, or the partnership; $270 interest from Julius C. Shapiro was reported. For 1945, $1,822.27*69 interest reported included $975 from Bennie Wolf and David Katz. At the time of trial he was about 85 years of age and had lived for about six years with his brother, the father of David Katz. Bennie Wolf's mother-in-law is a sister of R. Katz and lived in the same duplex apartment. R. Katz had one child, the wife of Julius Shapiro, a lawyer in Kansas City, Missouri. He lived with his daughter for several years after his wife died about 1940. He could not write or read English but could write his name. The petitioners financed the start of their business in 1941 by borrowing $4,500 from R. Katz. The amount was represented by a note. Federal income tax returns were signed and filed by each of the petitioners for the years 1942-1944, inclusive, with the collector for the sixth district of Missouri showing net income as follows: YearWolfKatz1942$ 4,405.71$4,418.4919436,252.926,120.87194410,767.539,541.64The Commissioner in the notices of deficiency increased petitioners' net income by the following amounts: BennieDavidWolfatz1942$ 5,735.30$ 4,012.93194322,734.2522,011.1519447,978.9214,549.99Total$36,448.47$40,574.07*70 Partnership returns signed by Katz were filed for Katz Shoe Stores for the years 1942-1945 reporting net income as follows: 1942$ 9,183.25194312,693.97194423,854.1119451,040.14 (loss)At the time that the partnership returns were filed books and records for the partnership were available. Records were kept for 1942. The return for 1942 was checked with the records and those for all the taxable years were inspected by Wolf. The matter of the income of the petitioners for the years 1942 to 1945 was referred to the Intelligence Unit of the Bureau of Internal Revenue by the collector's office for the district of Missouri in the early part of October 1945 and an investigation was started on October 17, 1945, on which date the petitioners were contacted by the revenue agent. He had possession of the returns of the petitioners while making the examination. The investigation was in its inception orally conducted with the petitioners. The agent asked several times for the records and the petitioners informed him that the books and records for the earlier part of 1941 and since the inception of the partnership up to June 30, 1943, were not available. He was*71 presented with some financial statements submitted to creditors. The credit statements sent out by the partnership were taken from the books and truly reflected the books. The agent because of the absence of the books and records requested the petitioners to furnish him with a net worth statement of their personal assets and liabilities. He was, principally from bank records, preparing a net worth statement on the partnership and told the petitioners that he was unable to reconcile from his net worth statements the income which they had reported on their partnership and individual income tax returns for the years 1942 to 1944, inclusive. He accepted as correct the partnership records submitted to him. A net worth statement was presented to him on November 26, 1945. It recited an indebtedness to Ruben Katz. He requested to see the documents and was presented with 18 promissory notes made to R. Katz, all except two upon the same printed form of note. They were received all in one bundle from David Katz. He had not prior thereto received any evidence of notes of R. Katz or loans of R. Katz to the business. Six of the notes were signed by Cecelia A. Katz and Sylvia Wolf, bearing the following*72 dates, in the following amounts: 1DateAmountJan. 9, 1943$10,000March 5, 19436,000Sept. 3, 19436,000Nov. 10, 19435,000Aug. 5, 194412,500Sept. 14, 19448,000Twelve of the notes were signed by David Katz and Bennie Wolf bearing dates, amounts and notations as follows: DateAmountNotationsNov. 10, 1942$ 5,000Cancelled Dec. 31, 1943April 6, 19435,000Paid in fullJuly 15, 19435,800Paid in fullAug. 6, 194310,000Balance cancelledOct. 7, 194310,000Cancelled Dec. 31, 1943Dec. 6, 19433,000Cancelled Dec. 31, 1943Jan. 8, 19448,500Paid in fullFeb. 21, 19445,000Paid in fullMarch 13, 19442,000Cancelled July 7, 1944April 28, 19441,500Cancelled Dec. 31, 1944Oct. 24, 19444,600Cancelled Dec. 31, 1944Nov. 2, 19444,500Cancelled Dec. 31, 1944 Each of the notations above listed appears on the face of the notes. The name, R. Katz, also appears on the face of each note. On the back of the note, dated August 6, 1943, appears the endorsement "Paid $6,100 R. Katz." On the back of the note, *73 dated November 10, 1942, appears the endorsement "Paid $1,000 Bal $4,000." The agent prepared his net worth statements between December 1945 and the earlier part of 1946. He prepared them principally from bank records, and as to furniture, jewelry and fixtures, as a last resort, financial statements furnished creditors by the petitioners, and from books and records provided by the petitioners for the latter part of 1943 and 1944, and after some oral discussions of assets with the petitioners. He first prepared the net worth of the partnership in order to arrive at the capital accounts of the petitioners, and then the individual net worth statements. In his inspection of the books that were made available to him he did not discover any loan entry or any evidence of the above listed loans by R. Katz to the petitioners. The agent did not include the notes to R. Katz in his computation of net worth. He set up the net worth of the Katz Shoe Stores at the end of each of the years 1941-1944, inclusive, as follows: $8,166.49; $14,691.83; $51,638.01; and $95,645.69, being an increase of $87,479.20 between December 31, 1941, and December 31, 1944. With the exception of minor items, the only*74 difference between net worth as determined by the agent and as contended by the petitioners at the hearing is his exclusion from net worth of the loans from R. Katz. The agent set up the net worth of the petitioners as follows: 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-31-4212-31-4312-31-44David Katz$5,083.25$ 9,514.67$32,646.69$50,238.33Bennie Wolf5,983.2413,124.2538,278.0951,550.58 In this computation the partnership capital of petitioners appeared as follows: 12-31-4112-31-4212-31-4312-31-44David Katz$4,083.25$ 7,345.92$25,819.01$38,258.28Bennie Wolf4,083.247,345.9125,819.0038,258.27The partnership, under date of February 26, 1945, filed with International Shoe Co. of St. Louis, Missouri, a financial statement, as of December 31, 1944, signed by David Katz for the firm, showing total assets of $148,400.64, total liabilities of $53,169.95, and net worth of $95,230.69. As of the same date, the agent's determination*75 of net worth of the partnership was $95,645.69, being $158,845.84 total assets and $63,200.15 liabilities. The partnership balance sheet as of January 30, 1945, showed total assets of $145,620.71, total liabilities of $46,466.78 and partnership capital of $99,153.93. Financial statements filed by the partnership with the International Shoe Co., under dates of July 7, 1941, January 1, 1942, July 15, 1942, January 22, 1943, February 15, 1944, May 31, 1944 and February 26, 1945, all contained under liabilities the following on the forms: "Owe Relatives, or Others for Borrowed Money?" and "Give Name, When Due, and How Secured." The first line ("Owe Relatives") was filled in on the financial statement of July 7, 1941, with the notation "2000.00" and explanation that it was a note due R. Katz, $2,000, payable by July 1943. On the financial statement for 1942, the same question was answered "1675.00," explained as a note due R. Katz in July 1943. On the financial statement for July 15, 1942, the same question is answered "2375.00," with explanation that it was a note due R. Katz in July 1943. The financial statement of January 22, 1943, recites the same question and "2375.00" as a note due*76 R. Katz, July 31, 1943. The financial statement of February 15, 1944, recites the same question and "3250.00" as a note due R. Katz. In the financial statements of May 31, 1944 and February 26, 1945, the questions as to money borrowed from relatives are blank as to answers. For the years 1942 to 1944, inclusive, respondent determined the income of David Katz to be, respectively, $8,258.28, $27,905.90 and $23,091.64, and determined the income of Bennie Wolf for the respective years to be $9,955.10, $28,445.36 and $17,772.49. These figures are after allowance for living expenses. For the year 1945, David Katz reported $50.21 and Bennie Wolf $416.02 as net income with no tax liability. The respondent adjusted these figures to $11,949.80 and $11,083.94, respectively. One Appel, a former special agent in the Federal Bureau of Investigation whose qualifications were admitted at trial and who had set up in the Federal Bureau of Investigation its laboratory for inspection of documents in 1932 and who retired from the service on January 1, 1949, and set up his own laboratory for the examination of handwriting specimens and who had testified in many cases on the subject of handwriting, had*77 submitted to him by letter, dated December 5, 1945, the matter of examination of the 12 promissory notes signed by David Katz and Bennie Wolf above described. The notes were sent to him. On December 19, 1945, the Federal Bureau of Investigation was authorized to make chemical and other tests requiring discoloration and cutting out portions of the lines in the notes. Report was made by the Bureau to the Internal Revenue Service in Kansas City, Missouri, on February 5, 1946. He made five classes of examination, by microscope, by chemical examination, by spectrographic test, by spectrophotometric test, and by age test or migration of ink. The notes were all prepared in two colors of ink, blue and black. The Federal Bureau of Investigation laboratory contained all the latest instruments which may be used in such an examination. From such tests, he concluded that the 12 notes, though bearing various dates, were all executed at the same time with the same pen and same ink except for signatures and concluded that they were executed and cancelled as a group very recently, about a month before the time of his examination, which was shortly after December 11, 1945; and that it would have been*78 impossible for the 12 notes to have been prepared at different times. He so testified at the trial of this cause. In the course of the trial there were also submitted to him the six notes signed by Sylvia Wolf and Cecelia A. Katz and applying three of the five tests, that is, the microscope, migration and chemical, he came to the same conclusion as to them. About three months later, after the trial, petitioner moved to further cross-examine the witness. The motion was allowed and extensive further cross-examination was had. There was placed in evidence at the trial a loose-leaf partnership ledger including a sheet showing an account under the caption "R. Katz, D. Katz, Cellia Katz, B. Wolf and Sylvia Wolf." The first entry is under date of January 1, 1943, showing a balance of $4,000. The last entry is under date of April 30, 1944, and indicates a balance of $47,510.33. The page bears in pencil a notation "See J. E. Apr 1944" and a notation "Transfer to Cap Ac." The ledger contains sheets showing a capital account for each of the petitioners starting with a balance on April 30, 1944, of $25,926.78, as to each. The only other books of the partnership placed in evidence were a cash*79 receipts book from November 1, 1943, and a cash-ledger-cash journal from January 1, 1943, and no journal entry referring to the account of R. Katz and petitioners and their wives, above described, appears in either of said books. The revenue agent who examined the ledger at the time of making his examination in the latter part of 1945 went through it in its entirety and did not see the page showing the account of R. Katz with petitioners and their wives. He did not include in his balance sheet the $39,335.33 liability showing as of December 31, 1943, on that account. The ledger contained, inter alia, pages showing accounts payable, inventories, furniture and fixtures, a TWA deposit of $425, notes payable, items which the revenue agent considered and included in setting up the net worth. R. Katz executed a will bearing date of February 21, 1946, in which he bequeathed to Cecelia A. Katz and Sylvia Wolf any unpaid balances "that may be due or owing me by them at the time of my death" on the six notes signed by them and above described. R. Katz had executed a will on March 21, 1945, which contained no provision for either Cecelia Katz or Sylvia Wolf and no provision as to the six notes*80 signed by them. R. Katz executed checks (which were cashed) in the amounts, upon the dates and to payees as follows: DateAmountFeb. 3, 1942$ 95Bennie WolfFeb. 18, 1942500Katz Shoe StoresAug. 10, 1942500Katz Shoe StoresOct. 29, 1942110Bennie WolfJuly 20, 19431,000Katz Shoe StoresAug. 11, 19431,000Katz Shoe StoresAug. 31, 19431,000Bennie WolfSept. 20, 19431,000Bennie WolfOct. 13, 19431,750Katz Shoe StoresOct. 16, 1943500Katz Shoe StoresNov. 3, 19431,200Katz Shoe StoresNov. 15, 1943265Bennie WolfJan. 14, 19441,500Katz Shoe StoresJan. 20, 194450Katz Shoe StoresOct. 25, 19442,000Katz Shoe StoresDavid Katz during 1943 or 1944 gambled in games where the losses sometimes ran to $5,000 at one sitting. At the time of trial he owed $13,000 to a party with whom he played cards sometimes every week end during that period. Katz Shoe Stores took inventory at the end of 1945. A physical test of the inventory was made. The pricing of the inventory, computations and additions were verified. At the end of 1945 Katz Shoe Stores marked down its inventory cost of shoes resulting in a decrease*81 in inventory of approximately $30,000. Although the markdown of inventory was on the basis of depreciation in shoes, the partnership was by March 23, 1946, able to realize a substantial profit on the sale of the depreciated shoes. The year 1945 was a good year in the shoe business, a buyers' market, when in general shoes that could be gotten could be sold. That year was Katz Shoe Stores' best year in volume. During that year non-rationed shoes were sold by Katz Shoe Stores at a loss of about $20,000. The partners withdrew $25,609.24 from the partnership during 1945. In August 1947 the partnership sold an accumulation of shoes, including nonrationed shoes which were hard to sell and broken line shoes of odd sizes. About 100 cases were sold for $200. In determining the deficiencies herein the Commissioner restored the $30,000 mark-down in inventory. A part of the deficiency in each of the taxable years 1942, 1943 and 1944 is due to fraud with intent to evade tax. Opinion The matter before us divides itself into two parts. As to 1942 to 1944, inclusive, the Commissioner set up income upon a net worth basis and charges that the deficiency is due to fraud with intent to evade tax. *82 As to 1945 no fraud is charged and the parties agree that the only question as to that year is as to the propriety of an increase in inventory. We will first deal with the years 1942-1944, inclusive. Because no records were produced as to the year 1942 and a portion of 1943 and because records thereafter were incomplete the internal revenue agent determined income on a basis of net worth, largely from such records and bank records, also credit statements from the partnership, with some oral assistance from the petitioners. The testimony is that the credit statements truly reflect the books of the partnership. This determination is reflected in the deficiency notices for the years 1942, 1943 and 1944. For those three years he added to their net income a total of $72,022.34. To meet this determination, and the charge of fraud, the petitioners adduced evidence, including 18 promissory notes totaling $112,400 made throughout the years 1942-1944 to R. Katz and take the view that the borrowings, represented by these notes, are explanatory of the difference in the net worth determinations by the Commissioner at the beginning and end of the period. The parties appear to be in agreement*83 that upon these notes the determination of this matter turns. On brief the petitioner refers to them as the heart of the matter and the respondent as the crux thereof. 3The petitioners' position is in effect that from time to time they or their wives gave notes to and received money from R. (Ruben) Katz, which was "devoted to the use of Katz Shoe Stores." Twelve notes signed by the petitioners bear various dates running from November 10, 1942 to November 2, 1944, all totaling $64,900. Six notes signed by Sylvia Wolf, wife of Bennie Wolf, and Cecelia A. Katz, wife of David Katz, all made to R. Katz, bear various dates from January 9, 1943 to September 14, 1944, and*84 total $47,500. All of these notes, the respondent contends, were executed at the same time, about December 1945, after the petitioners knew from the internal revenue agent examining their returns that he was proceeding on a net worth basis, and were, the respondent argues, fraudulently prepared to explain the income of the petitioners. The petitioners and their wives and Ruben Katz, the payee of all of the notes, testified to the effect that the notes were not executed at one time but at various times. The testimony was indefinite, sometimes approaching the evasive, as to whether the notes were executed on or about the dates shown thereon. Ruben Katz testified in a large part through an interpreter. He was 85 years of age, and lived with the father of petitioner Katz and in the same duplex building with the mother-in-law of petitioner Bennie Wolf. In addition to the testimony of the above parties the petitioners produced at trial a loose leaf ledger, with pages not numbered, containing a sheet which it is contended indicates that the borrowings from R. Katz by the petitioners and their wives were at least as early as November 1943 shown upon the ledger of Katz Shoe Stores, and the*85 witness Harry Brenner, a public accountant employed by the petitioners as early as November 1943, testified that he made entries in the loan account in the general ledger designated as "Loans Ruben Katz., David Katz, Cellia Katz, Bennie Wolf and Sylvia Wolf" and transferred in April 1944 $47,000 from the loan account to the petitioners' capital accounts. Witness Harry J. Kuehn, certified public accountant who had worked on this case for petitioners, and who had made an audit in 1945, for 1945, testified that the page in the ledger showing that account was in the ledger in June 1945. The witness Held, the revenue agent who made the examination, beginning in October 1945, testified that in his inspection of the books made available to him he discovered no loan entries or any evidence of loans from R. Katz to the petitioners; that he had not received any evidence of notes of R. Katz or loans of R. Katz to the business prior to November 1945 when the 18 notes were made available to him, in one bundle, by David Katz; that he did not include the notes in his computation of net worth and used bank figures, financial statements submitted by the petitioners to creditors and the partnership*86 books and records submitted to him; and that he examined the ledger in its entirety, went through it, and did not see the sheet (relied upon by petitioners). The respondent's position is based upon the testimony of one Appel a special agent of the Federal Bureau of Investigation who though retired and in private practice at the time of his testimony was in that Bureau when in the early part of December 1945 the 12 notes signed by the petitioners themselves were sent to him for examination, and a little later examined by him. The six notes signed by the wives were examined by him at the time of the trial, that is, were placed in his possession overnight and for several hours for examination, after which his testimony was taken in that respect. Five separate tests were applied to the 12 notes and three tests to the six notes, by the agent of the Federal Bureau of Investigation. The facilities for such examination were the latest known to science. The witness had set up the laboratory for that purpose in the Federal Bureau of Investigation in 1932. At the time of his original examination of the 12 notes, when he concluded that they were all written at the same time and shortly prior*87 to the examination, he was still in the Federal Bureau of Investigation though at the time of testimony he was a private practitioner. We are here faced with a squaretoed conflict between the testimony of several interested witnesses and the conclusions of the special agent of the Federal Bureau of Investigation, whose qualifications were admitted. A great mass of evidence bearing upon this crucial point was submitted to us, but the question is purely one of choice between the interested witnesses and the scientific examination of the notes, and we think it unnecessary to detail the evidence considered by us. After careful examination of all of such evidence, including conflicts in the statements of witnesses, their interest, and the demeanor of the witnesses on the witness stand, we have come to the conclusion that the notes were not executed at different times and places but were all executed at one time, after the petitioners had learned of the investigation by the revenue agent, and in order to explain their income in the years 1942, 1943 and 1944. We can come to no other conclusion in the face of the fact that five (three as to the wives' notes) separate and distinct tests by*88 a disinterested witness, highly qualified and using the latest methods known to science, negatived the idea that the notes were executed at different times over a period of some two years but indicated that they were executed at the same time, about a month before the examination thereof which was after December 5, 1945, and before report on February 5, 1946, therefore after start of the investigation on October 17, 1945. It is true that R. Katz financed the original start of the stores with about $4,500 and that he made checks to the extent of about $12,500 to Katz Shoe Stores and to Bennie Wolf, but these checks are not so connected with the notes as to be any convincing explanation of them either in dates or in amount, and are not shown not to enter into the book accounts examined and considered by the revenue agent in arriving at net worth and income. Borrowed money placed in the business as contended would not, unless the books were not properly kept, affect the net worth of the business. Though R. Katz stated that he had lent the petitioners and their wives a large sum of money there is discrepancy in the account he gave and those given by the wives in that he stated that he*89 handed the money to them personally in cash (one $12,500 at their home), whereas they both stated they never received any money, merely signed notes, except that Cecelia Katz stated that she once received a cashier's check which she handed back to her husband. Ruben Katz, asked why he did not give the money to David Katz and Bennie Wolf, replied that he thought the women would be more disposed to save the money than the husbands, but also testified that the money was used to pay bills where goods were bought, and, as to one $12,500, that they should give it to their husbands. The notes from petitioners total $33,800 in 1943; yet R. Katz testified that they owed only about $12,000 in any one year. The account appearing at the time of trial in the ledger, and which, it is contended, evidences the loans from R. Katz, is not convincing. The witnesses whose testimony it is contended bear out the account can not be considered to be disinterested considering their connection with the petitioners. We are unable to believe that the revenue agent who examined the ledger, in his investigation and effort to locate the income of the petitioners, merely overlooked such an account, which on its face*90 involves the very matter into which he was looking. He considered various other accounts appearing in the ledger. It is noticeable too that the sheet showing the account refers to a journal entry but that no such journal entry is shown in the books produced, and the accountant who made the audit in 1945 testified that the books worked on by him were a general ledger, cash receipts book, and a cash register or check disbursement book. It is plain that there was no journal. It is noted too that he found $12,768.70 undetermined receipts, in 1943, as to which he could not determine whether they were sales or loans; also the lack of books for 1942 and a part of 1943 is nowhere explained. They were not "available" to the investigator. The petitioners produced what books were "available" but there is no evidence that they had been lost, destroyed or stolen, or why they were not available to the examiner. We have noticed too that no interest from petitioners is reported by R. Katz until the return for 1945 (which would be filed after the end of 1945, therefore after this matter came up) though in 1943 and 1944 he reports interest received from his son-in-law Julius Shapiro. We conclude and*91 hold that the Commissioner is not shown to have erred in the determination of income in 1942, 1943 and 1944 and that a part of the deficiencies in each of said years is due to fraud with intent to evade tax and that the Commissioner did not err in the addition of the 50 per cent penalty. The petitioners urge that the net worth determination is erroneous because of certain checks outstanding at the close of the taxable years 1942, 1943 and 1944; also that depreciation on furniture and fixtures in 1943 and 1944 was not taken into consideration; and that the respondent has failed to give effect in his determinations for 1942 and 1943 to the tax forgiveness provisions of the Current Tax Payment Act of 1943. It appears from the record that the examining agent started without records for 1941 and 1942 so that we consider that the petitioners have not shown error because of outstanding checks. Checks were missing from such records as were furnished the agent. However, it also appears that the agent admitted as a witness that there was error in his computations to the extent of $2,958.12 checks outstanding at the end of 1944. It appears also that depreciation on furniture and fixtures was*92 not considered at the close of each of the years 1942 and 1943 in the amount of $315.58. With reference to the petitioners' contention that the Commissioner did not give effect to the tax forgiveness provisions as to 1942 and 1943, the answer is of course that, under the last sentence of section 6 of the Current Tax Payment Act of 1943, the forgiveness provisions do not apply to a case in which additions to the tax are applicable by reason of fraud. We having upheld the Commissioner's contention that there was fraud, the forgiveness feature is not to be applied. As to the year 1945 the only question before us is the propriety of the restoration by the Commissioner of a $30,000 mark-down in inventory. For that year fraud was not charged. In our opinion, the facts placed in evidence do not demonstrate error on the part of the Commissioner. Regulations 111, Sec. 29.22(c)-2. The petitioners in effect attempt to explain the matter by a sale of about 100 cases of shoes, including non-rationed shoes and other broken lines and odd sizes, for $200, but this sale took place in August 1947 and the indefiniteness as to whether such shoes were those on hand in 1945, the fact that during 1945*93 non-rationed shoes were sold by Katz Shoe Stores at a loss of about $20,000, and the fact that by March 25, 1946, the depreciated shoes had been sold at a substantial profit all tend to negative any error in the restoration of the mark-down of shoes. The evidence indicates that 1945 was a good year in the shoe business and the best, at least so far as volume was concerned, for the partnership. All of these facts can not be reconciled with a proper mark-down of $30,000. The Commissioner is not shown to have erred in such restoration. Decisions will be entered under Rule 50. Footnotes1. Four of these six notes were upon the same printed form as the twelve notes.↩2. This was after allowance of living expenses as follows: For Katz for 1942, $4,000, for 1943, $5,000, for 1944, $6,000; and for Wolf for 1942, $3,000, for 1943, $4,000, and for 1944, $5,000.↩3. On brief the respondent says "As conceded by petitioners' counsel throughout the record, the 'crux' of this case, insofar as the fraud years are concerned, is the extent and authenticity of alleged borrowings from Ruben Katz * * *," and on brief the petitioners' language is "Petitioners * * * submit that the supposed increases in net worth upon which respondent relies is explained by loans made to them and their wives by their uncle, Ruben Katz, and devoted to the use of Katz Shoe Stores. This dispute is entirely one of fact."↩